RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0337P (6th Cir.)
File Name: 01a0337p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RUSSELL T. ANDERSON,
    *Plaintiff-Appellant,*

    *v.*

No. 99-2409

CHARTER TOWNSHIP OF
YPSILANTI,
    *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 94-70047—Paul V. Gadola, District Judge.

Argued: August 1, 2001

Decided and Filed: September 21, 2001

Before: CLAY, GILMAN, and WALLACE, Circuit
Judges.[*]

---

[*]The Honorable J. Clifford Wallace, Circuit Judge of the United
States Court of Appeals for the Ninth Circuit, sitting by designation.

—————————

**COUNSEL**

**ARGUED:** Gerard Mantese, MANTESE, MILLER & SHEA, Troy, Michigan, for Appellant. Julie McCann-O'Connor, O'CONNOR, DeGRAZIA & TAMM, Bloomfield Hills, Michigan, for Appellee. **ON BRIEF:** Gerard Mantese, MANTESE, MILLER & SHEA, Troy, Michigan, for Appellant. Julie McCann-O'Connor, Paul T. O'Neill, O'CONNOR, DeGRAZIA & TAMM, Bloomfield Hills, Michigan, for Appellee.

—————————

**OPINION**

—————————

RONALD LEE GILMAN, Circuit Judge. Russell T. Anderson filed suit in a Michigan state court, challenging the Charter Township of Ypsilanti's denial of his application for rezoning. Anderson's lawsuit, in which both federal and state causes of action were alleged, was removed to the appropriate federal district court by the Township. Pursuant to the *Pullman* abstention doctrine, the district court remanded the state claims back to the Michigan state court, while retaining jurisdiction over and placing a stay on the pending federal causes of action. After the state trial court ruled on the state claims several years later, Anderson returned to federal court, requesting that the stay be lifted and the federal claims resolved by the district court. The district court instead dismissed the federal claims, reasoning that any adjudication of the remaining claims would run afoul of the *Rooker/Feldman* abstention doctrine. For the reasons stated below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.  Factual background

Anderson is the owner of three parcels of land in the Township.  On one 8-acre parcel he has developed an apartment complex known as the Russell Anderson Apartments.  The second plot of land, comprising 8.15 acres and lying immediately west of the developed parcel, is undeveloped and classified by the Township as a multiple-family residential parcel.  Finally, the third parcel, which lies directly west of the 8.15 acre undeveloped plot, is a 15-acre plot of land which is zoned for light industrial use.  It is this third parcel that is the subject of the underlying lawsuit.  According to Anderson, the 15-acre lot is landlocked and therefore incapable of being developed for light industrial use.

On March 16, 1988, Anderson filed a petition with  the Township, requesting that the 15-acre parcel be rezoned for multiple-family residential use.  He proposed that the Russell Anderson Apartments be expanded onto both of the undeveloped parcels that are west of the current apartment complex.  The petition was approved by the Township Planning Commission and the Washtenaw County Metropolitan Planning Commission.  Despite these positive recommendations, however, the final decision-making body, the Township Board, rejected the proposal on October 18, 1988.

### B.  Procedural background

Anderson filed his initial complaint against the Township on November 15, 1988 in the Washtenaw County Circuit Court, alleging only state-law claims. After the state trial court dismissed his suit on the basis that there had been no unconstitutional taking and that the Township had not acted illegally, Anderson appealed to the Michigan Court of Appeals.  The state appellate court reversed the Washtenaw County Circuit Court, concluding that the trial court had applied an incorrect standard of review.   On remand, Anderson filed an amended complaint, alleging that (1) the

zoning was an uncompensated taking in violation of both the Fifth Amendment to the United States Constitution and Article 10, § 2 of the Michigan Constitution, (2) the zoning deprived Anderson of his right to property and to the due process of law in violation of the Fourteenth Amendment to the United States Constitution, and (3) the Township acted illegally under color of state law, in violation of 42 U.S.C. §§ 1983 and 1988. Because the complaint as amended now contained federal causes of action, the Township timely removed the case to the United States District Court for the Eastern District of Michigan on January 4, 1994.

Anderson promptly moved to remand the case back to the Washtenaw County Circuit Court, arguing that "unsettled issues of state law predominate" and that "plaintiff's state law claims are intertwined and virtually indistinguishable from the federal claims and, under the *Pullman* abstention doctrine, a ruling on plaintiff's federal constitutional claims by this court can be avoided by an appropriate determination of state law in the Washtenaw County Circuit Court." The district court granted Anderson's motion to remand the state-law claims back to the state court, although the district court noted that "it is unclear which portions of the state constitution plaintiff seeks to have applied to his claims." Stating that an attempt to reconcile state and federal takings law would be unduly burdensome, the district court reasoned that

> [i]n the instant case, the state-law claims and the federal-law claims do arise out of a common nucleus of fact. However, a plaintiff would not be expected to try them all in one judicial proceeding. Without having exhausted his state law remedies, plaintiff's federal claims are premature . . . If plaintiff obtains the relief he is seeking at the state court level, the need for this court to decide plaintiff's constitutional and statutory claims will be obviated.

Instead of accepting pendent jurisdiction over the state-law claims, the district court then applied the abstention doctrine set forth in *Railroad Comm'n of Texas v. Pullman Co.*, 312

court, challenging the state trial court's alleged denial of his due process rights as a result of the three and a half year delay in the issuance of its decision. Even if we ignore the fact that this is a new cause of action never before raised in any pleadings, *see White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 558-59 (6th Cir. 1990) (holding that even under the standards requiring liberal construction of pleadings, a party cannot pursue unpled claims), Anderson simply has no standing to assert this new claim against the Township.

In order to satisfy Article III's requirement that a federal court adjudicate only actual "cases and controversies," a plaintiff must "establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." *Warth v. Seldin*, 422 U.S. 490, 505 (1975). The defendant in this suit is the Charter Township of Ypsilanti. Anderson does not claim that the Township was in any way at fault for the state trial court's delay, nor does he argue that the Township could remedy the alleged violation. The Township, then, is not the proper defendant against whom this claim may be asserted. *Id*. at 498 ("In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III."). This claim is instead asserted against an entirely separate entity – the Washtenaw County Circuit Court. Anderson therefore has no standing to make this claim against the Township. For this reason, the district court did not err in dismissing Anderson's challenge to the state trial court's delay.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

States Supreme Court precedent analyzing takings claims under the Fifth Amendment, and he made no effort to clarify that his argument on appeal was limited to Article 10, § 2 of the Michigan Constitution.

A party who is carefully guarding his right to return to federal court to litigate the federal issues, and who believes that the state and federal constitutional provisions are sufficiently distinct to warrant an evaluation by a federal court, should be much more explicit in having the state appellate court specifically address the state-law questions only. Indeed, nowhere in Anderson's state appellate brief does he cite either the United States or Michigan Constitutions. He instead based his entire argument on the generalized doctrine of takings law as proffered by the United States Supreme Court and the Michigan Supreme Court. His argument on appeal to the Michigan Court of Appeals thus went far beyond the limited-notice requirement of *Windsor*. Anderson therefore waived his right to pursue these claims in federal court, despite the district court's retention of the federal claims. *See Button*, 371 U.S. at 427-28.

Finally, this case is unlike *England* in that it is clear from the record that Anderson's preference all along was for the state courts to adjudicate his various takings claims. He not only filed both his first and second complaints in state court, but was also the party who sought the remand to state court after the Township removed the case to the federal district court. Thus, unlike *England*, where the plaintiff was consistently frustrated in obtaining a federal forum, there is no such unfairness to Anderson, who has now had his claims evaluated by the very state forum he selected in the first place. We therefore affirm the district court's dismissal of Anderson's original federal claims.

**D.  The district court did not err in dismissing Anderson's new due process argument against the state trial court**

Anderson also raised a new constitutional argument for the first time in his June 22, 1999 brief addressed to the district

U.S. 496, 501 (1941), authorizing the remand of state-law claims to the state courts under appropriate circumstances. The district court retained jurisdiction over the federal causes of action, and placed a stay on those claims. In its remand ruling, the district court noted that the stay was intended to preserve "the *defendant's* right to have a federal court determine the federal issue." (emphasis added).

After the state-law claims were remanded to the Washtenaw County Circuit Court, the state court held a bench trial late in 1994, following which both parties submitted proposed findings of fact and conclusions of law. The case then remained under advisement in the state court for the next three and a half years. This caused Anderson to finally file a complaint for a "writ of superintending control" with the Michigan Court of Appeals in April of 1998, requesting that the trial court be ordered to issue a judgment and schedule a hearing on damages. One week later, the state trial court issued its decision, rejecting all of Anderson's state claims and entering judgment for the Township. This decision was appealed by Anderson to the Michigan Court of Appeals.

On June 22, 1999, Anderson filed a motion in the district court to lift the stay on the federal claims and for summary judgment in his favor. His motion not only raised the federal-takings claim and the due process claim previously stayed by the district court, but also included a charge that his due process rights were violated by the state trial court's long delay in issuing its opinion. On November 8, 1999, the district court dismissed Anderson's suit, concluding that the *Rooker/Feldman* abstention doctrine deprived it of subject matter jurisdiction.

Anderson appeals, arguing that the district court erred in concluding that it had no jurisdiction to hear the deferred federal claims and the new due process challenge to the state court's delay. On December 1, 2000, while this appeal was pending, the Michigan Court of Appeals affirmed the judgment of the state trial court.

## II. ANALYSIS

### A.   Application of the *Pullman* abstention doctrine

As a threshold matter, we cannot help but note that the procedural complexities now facing us could have been entirely avoided if the district court had simply denied Anderson's motion to remand the case back to the state trial court. In its application of the *Pullman* abstention doctrine, the district court reasoned that Anderson's claim under the Michigan Takings Clause would obviate the need for a federal court's determination on the parallel Fifth Amendment takings claim. The Supreme Court, however, "has previously determined that abstention is not required for interpretation of parallel state constitutional provisions." *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 237 n.4 (1984). Furthermore, the classic reason to apply the *Pullman* abstention doctrine is where the remanded state-law question is an independent and unsettled issue best decided by the state courts, *see Harris County Comm'rs Court v. Moore*, 420 U.S. 77, 83-84 (1974), a circumstance not present in the case before us.

The Court in *Moore* described the considerations that should be taken into account when deciding whether to apply this abstention doctrine:

> Where there is an action pending in state court that will likely resolve the state-law questions underlying the federal claim, we have regularly ordered abstention. Similarly, when the state-law questions have concerned matters peculiarly within the province of the local courts, we have inclined toward abstention. On the other hand, where the litigation has already been long delayed, or where it has seemed unlikely that resolution of the state-law question would significantly affect the federal claim, the Court has held that abstention should not be required.

*Id*. at 83-84 (internal citations omitted). Had the district court taken into account the above considerations, it would almost certainly have concluded that *Pullman* abstention was not warranted in the present case. *See Midkiff*, 467 U.S. at 237

conclusion that a litigant who has properly invoked the jurisdiction of a Federal District Court to consider federal constitutional claims can be compelled, without his consent and through no fault of his own, to accept instead a state court's determination of those claims." *Id*. at 415.

Turning to the case before us, we must inquire whether Anderson made an *England*-type reservation in the state court record and, if not, the extent to which he simply informed the state court of his federal claims as opposed to actually litigating them in that forum. Anderson acknowledges that he did not make a reservation on the record in the state court as required by *England*. He instead relies on the district court's statement in its 1994 order remanding the state-law claims back to state court that "[t]he court will therefore stay any further action on the federal claims, thereby preserving the *defendant's* right to have a federal court determine the federal issues." (emphasis added).

Anderson insists that the district court's statement is sufficient to constitute an *England* reservation. As a threshold matter, however, an *England* reservation must be made by *a party* in the *state* court. *See England*, 375 U.S. at 421. The statement in the district court's order was neither made by a party nor placed in the state court's record. Moreover, the order makes no mention of preserving the *plaintiff's* right to litigate in the federal court, a right that Anderson never sought in the first place.

Because neither party made a reservation sufficient to satisfy *England*, we must determine if Anderson's presentation of his pending federal claims in the Michigan courts was limited to the notification required by *Windsor*, or if he actually litigated the federal causes of action such that his right to return to federal court was waived under *Button*. An examination of Anderson's brief submitted to the Michigan Court of Appeals indicates that his discussion of the federal causes of action in the state courts went far beyond that required by *Windsor*. His presentation of the takings issues in his state appellate brief relied heavily on United

Virginia Supreme Court on the plaintiff's federal claims was proper, despite the fact that a district court had retained jurisdiction over those same claims pursuant to a *Pullman* remand order).

Thus, prior to *England*, plaintiffs subject to a *Pullman* remand order were uncertain about their future ability to pursue their federal claims in federal court. On the one hand, they had to at least inform the state court of their federal claims. But if they crossed the line between informing the state court of their federal claims and actually litigating these claims in the state court, the ability to pursue those causes of action in their preferred federal forum would be waived. *England* resolved this dilemma by providing, in a case partially remanded back to state court pursuant to *Pullman*, that

a party may readily forestall any conclusion that he has elected not to return to the District Court. He may accomplish this by making on the state record the 'reservation to the disposition of the entire case by the state courts' that we referred to in *Button*. That is, he may inform the state courts that he is exposing his federal claims there only for the purpose of complying with *Windsor*, and that he intends, should the state courts hold against him on the question of state law, to return to the District Court for disposition of his federal contentions.

*England*, 375 U.S. at 421.

If a plaintiff does not make such an explicit reservation in the state court record, he may still return to federal court to pursue the remaining federal claims "unless it clearly appears that he voluntarily did more than *Windsor* required and fully litigated his federal claims in the state courts." *Id*. Without such a reservation, however, the district court must examine the course of the litigation in the state forum and decide if the plaintiff has "elected to forgo his right to return to the District Court" by litigating the federal claims in state court, and having them decided there. *Id*. at 419. The holding in *England* is grounded in the "fundamental objections to any

n.4; *see also Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (holding that abstention, in general, should be applied only in "exceptional circumstances"). A denial of Anderson's motion to remand would thus have avoided this procedural morass altogether. Nevertheless, we are now faced with the application of still another abstention doctrine by the district court.

## B. Application of the *Rooker/Feldman* abstention doctrine

We analyze a district court's conclusion that it lacked subject matter jurisdiction under a de novo standard of review. *See Green v. Ameritech Corp.*, 200 F.3d 967, 972 (6th Cir. 2000). The district court dismissed Anderson's federal claims based on its conclusion that it had no jurisdiction pursuant to the *Rooker/Feldman* abstention doctrine. *See Anderson v. Charter Township of Ypsilanti*, 71 F. Supp. 2d 730 (E.D. Mich. 1999). This form of abstention "stands for the simple . . . proposition that lower federal courts do not have jurisdiction to review a case litigated and decided in state court; only the United States Supreme Court has jurisdiction to correct state court judgments." *Gottfried v. Med. Planning Servs.*, 142 F.3d 326, 330 (6th Cir. 1998).

Such a rule is bolstered by the negative inference drawn from 28 U.S.C. § 1257(a), which states that "[f]inal judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court by writ of certiorari." *See District of Columbia Ct. of Appeals v. Feldman*, 460 U.S. 462, 476 (1983) (citing § 1257 in support of its decision to abstain). Thus, when a district court is presented with claims that are "inextricably intertwined" with the judgment of a state court, the federal court "does not have jurisdiction over these elements of the . . . complaints." *Id.* at 486-87.

The two plaintiffs in *Feldman*, who had been denied permission to sit for the bar examination by the highest court of the District of Columbia, sued that court in federal district court. They challenged both the specific decisions denying

them admission to the exam and the constitutionality of the underlying local statutes authorizing such denials. In affirming the dismissal of the former claims, the Supreme Court reasoned that the "allegations that the District of Columbia Court of Appeals acted arbitrarily and capriciously in denying [plaintiffs'] petitions for waiver [of the bar examination requirements] . . . are inextricably intertwined with the District of Columbia Court of Appeals' decisions." *Id*. at 486-87. The latter claims, however, challenging the bar examination rules themselves, were permitted to go forward, because the issue presented to the district court would not be the correctness of the District of Columbia Court of Appeals's decision, but would instead be the constitutionality of the rule that the District of Columbia court applied. *Id*. at 487.

In a later case, Justice Marshall succinctly restated the *Rooker/Feldman* doctrine when he reasoned as follows:

> While the question whether a federal constitutional challenge is inextricably intertwined with the merits of a state-court judgment may sometimes be difficult to answer, it is apparent, as a first step, that the federal claim is inextricably intertwined with the state-court judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it. Where federal relief can only be predicated upon a conviction that the state court was wrong, it is difficult to conceive the federal proceeding as, in substance, anything other than a prohibited appeal of the state-court judgment.

*Pennzoil Co. v. Texaco, Inc.* 481 U.S. 1, 25 (1987) (Marshall, J., concurring); *see also Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416 (1923) (dismissing a complaint that a judgment of the Supreme Court of Indiana violated several federal constitutional provisions, because "[t]o do so would be an exercise of appellate jurisdiction. The jurisdiction possessed by the District Courts is strictly original.").

Courts applying the *Rooker/Feldman* abstention doctrine have done so in two types of cases: (1) cases that constitute a

prudent course for a district court finding itself in a similar situation in the future would be to refrain from dismissing the case on the basis of the *Rooker/Feldman* abstention doctrine until the full scope of the decision in the state court system has been ascertained.

## C.    Application of the *England* reservation doctrine

Although the subsequent opinion of the Michigan Court of Appeals renders the district court's *Rooker/Feldman* decision correct in hindsight, we conclude that the district court could have dismissed Anderson's federal claims without waiting for the state appellate decision on the basis that he effectively waived his right to pursue these claims in federal court under the *England* reservation doctrine. This conclusion is based on the case *England v. Louisiana State Bd. of Med. Exam'rs*, 375 U.S. 411 (1964), in which the Supreme Court established a procedure by which a party, whose case is partially remanded to the state courts pursuant to the *Pullman* abstention doctrine, may reserve the right to litigate the federal claims in the federal court.

Such a procedure became necessary following the Supreme Court's decisions in *Government and Civic Employees Organizing Committee v. Windsor*, 353 U.S. 364 (1957), and *NAACP v. Button*, 371 U.S. 415 (1963). In *Windsor*, the Supreme Court held that the plaintiff challenging a state statute had to notify the state court as to any pending federal claims that were not being remanded by the district court, so that the statute in question could be construed by the state court in light of those claims. *See Windsor*, 353 U.S. at 366. This, however, "does not mean that a party must litigate his federal claims in the state courts." *England*, 375 U.S. at 420 (limiting the holding of *Windsor*). Nevertheless, if a party "elects to seek a complete and final adjudication of his rights in the state courts, the District Court's reservation of jurisdiction is purely formal," and a final judgment by the state court on those federal claims will still be considered conclusive. *Button*, 371 U.S. at 427 (holding that the United States Supreme Court's jurisdiction over the judgment of the

acre parcel's classification of light industrial use is unreasonable, or that the parcel is either unsuitable or unmarketable under that classification. Plaintiff also fails on the third prong because he did not demonstrate that he had reasonable investment-backed expectations that he could build multiple-family housing on the 15-acre parcel of property.

*Anderson v. Charter Township of Ypsilanti*, No. 211997 at 5-6 (Mich. Ct. App. Dec. 1, 2000) (unpublished).

The district court concluded that addressing the merits of Anderson's federal-takings claims would place it in the position of reviewing the state court's decision. Because the subsequent Michigan Court of Appeals ruling addressed both the categorical and noncategorical takings claims, the district court's conclusion was proven correct in hindsight. At the time of the district court's order, however, no state court had ruled on Anderson's noncategorical takings claim. Thus, if the district court had narrowly limited its adjudication to the merits of Anderson's noncategorical takings claim, it is arguable that the *Rooker/Feldman* abstention doctrine would not have been implicated in this case, because the district court would not have been faced with the question of whether "the state court wrongly decided the issues before it." *Pennzoil Co. v. Texaco, Inc.* 481 U.S. 1, 25 (1987) (Marshall, J., concurring); *see also* Laurence H. Tribe, American Constitutional Law § 3-30, 595-96 (3d ed. 2000) (exploring the still-open question as to whether the *Rooker/Feldman* abstention doctrine should be limited to only bar federal adjudication of those issues "actually decided" by a state court).

Now that the Michigan Court of Appeals has addressed the noncategorical takings claim, however, we need not delve into the merits of such a *Rooker/Feldman* argument. On the other hand, if the Michigan Court of Appeals had *not* ruled on Anderson's noncategorical takings claim, a serious question would have been presented concerning the district court's dismissal of the action. We therefore suggest that the more

direct attack on the substance of the state court opinion, and (2) cases that challenge the procedures by which a state court arrived at its decision. *See Catz v. Chalker*, 142 F.3d 279, 294-95 (6th Cir. 1998) (distinguishing between these types of *Rooker/Feldman* cases). In this appeal, the *Rooker/Feldman* issue is of the first type, i.e., whether the district court's conclusions regarding Anderson's federal-takings claim place it in the position of evaluating the merits of the state trial court's decision.

The district court concluded that "[Anderson's] motion for summary judgment effectively asks this Court to adjudicate issues which are *inextricably intertwined* with those issues already decided upon by the state court." *Anderson*, 71 F. Supp. 2d at 734 (emphasis in original). After a careful analysis of Michigan and federal regulatory-takings law, as well as the specific rulings of the Michigan state trial and appellate courts, we conclude that the district court's dismissal on the basis of the *Rooker/Feldman* abstention doctrine was correct in hindsight, even if premature.

Under the Fifth Amendment, unconstitutional regulatory takings can occur in two situations. First, "a regulation which 'denies all economically beneficial or productive use of land' will require compensation under the Takings Clause." *Palazzolo v. Rhode Island*, 121 S. Ct. 2448, 2457 (2001) (citing and quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992)). The second avenue through which a plaintiff may pursue a regulatory-takings claim under the Fifth Amendment occurs when "a regulation places limitations on land that fall short of eliminating all economically beneficial use." *Id.* (citing *Penn. Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)). Federal-takings law thus incorporates both a "categorical taking," in which land is deprived of *all* value, and a noncategorical taking, in which land is deprived of some but not all of its economic value as a result of government regulation. *See Lucas*, 505 U.S. at 1019 n.8 (employing the term "categorical" to the first type of regulatory takings claims).

In the categorical-taking case, once it is proven that a regulation has deprived the land of all economic value, compensation is automatically required under the Fifth Amendment. *See id.* at 1015. The determination of whether a taking has occurred in the noncategorical case, however, is made pursuant to an "ad hoc factual inquir[y]," in which three factors have been identified that "have particular significance in the takings inquiry: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *In re Blue Diamond Coal Co.*, 79 F.3d 516, 524 (6th Cir. 1996) (citation and internal quotation marks omitted).

Under the Michigan Constitution, like the federal Constitution, uncompensated takings are prohibited. Article 10, §2 of the Michigan Constitution states that "[p]rivate property shall not be taken for public use without just compensation therefor being first made or secured in a manner prescribed by law." The substantive requirements of the Michigan Takings Clause are indistinguishable from those that the Supreme Court has held are required by the Fifth Amendment. *See Adams Outdoor Adver. v. City of East Lansing*, 614 N.W.2d 634, 638 (Mich. 2000) (applying the categorical/noncategorical distinction from *Lucas* to a takings claim brought under both the federal and Michigan takings clauses, without differentiating between the two).

In *K&K Constr., Inc. v. Dep't of Natural Res.*, 575 N.W.2d 531 (Mich. 1998), the Michigan Supreme Court engaged in a prolonged discussion of the various types of regulatory-takings claims. The Michigan Supreme Court, however, cited both the Fifth Amendment and Article 10, § 2 of the Michigan Constitution, without addressing what differences, if any, existed between the two provisions. Furthermore, in its discussion and application of the law, the *K&K* court relied solely on Supreme Court Fifth Amendment jurisprudence. *K&K* also mentioned a third avenue for a regulatory-takings claim "where the regulation does not substantially advance a legitimate state interest." *Id.* at 535 (citing *Keystone*

*Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485 (1987)).

The state trial court rejected Anderson's takings claim, concluding as follows:

In order to state a legally cognizable claim for an unconstitutional taking of land, a property owner must establish that he has been deprived of all use of his property. *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304 (1987). Plaintiff has failed to so demonstrate.

In its short analysis of this question, the state trial court discussed the competing evidence regarding the value of the land and concluded that Anderson had failed to prove that all economically viable uses had been stripped from him. This conclusion ignored the other avenue for a regulatory-takings claim, where a court must determine if the land has been deprived of only some of its economic value. *See Penn. Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 123-28 (1978) (explaining the factors that should be taken into account when deciding if a particular regulation that deprives the subject property of some but not all of its value is a Fifth Amendment taking).

The Michigan Court of Appeals, however, in its opinion affirming the state trial court, also took into consideration Anderson's claim of a noncategorical deprivation. The state appellate court reasoned as follows:

Plaintiff also has not demonstrated that he should prevail under the traditional "balancing test," under which the reviewing court engages in an ad hoc, factual inquiry of "(1) the character of the government's action, (2) the economic effect of the regulation on the property, and (3) the extent by which the regulation has interfered with distinct, investment backed expectations. *See Penn Central, supra*, 438 U.S. at 124; *K&K, supra* at 577. Plaintiff fails on the first two prongs of this test because, as we concluded above, he did not establish that the 15-